Samuel H. Hofstadter, J.
Tenants dwelling in two tenement houses have brought this proceeding under article 78 of the Civil Practice Act to annul a determination and order of the State Bent Administrator granting certificates to evict them from their homes. The avowed purpose of the eviction is to enable the owner of the two buildings recently acquired by it — in fact the deed for one was not even executed until after the application to evict the tenants had been filed — to demolish them and to use the land on which they stand for the expanding needs of an adjoining parking lot now operated by the same owner. Justification for the eviction so sought is said to be found in a provision of the State Besidential Bent Law and an implementing section of the State Bent and Eviction Begulations dealing with the withdrawal of housing accommodations from the rental market. The question to be decided here is whether the owner may be permitted to accomplish this objective within the framework of the emergency housing legislation.
The State Besidential Bent Law declares: “ Nothing in this act shall be construed to require any person to offer any housing accommodations for rent, but housing accommodations already on the rental market may be withdrawn only after prior written approval of the state rent commission, if such withdrawal requires that a tenant be evicted from such accommodations.” (§ 10, subd. 4; L. 1946, ch. 274, as amd. by L. 1951, eh. 443.)
Section 59 of the regulations, entitled “ Withdrawal of occupied housing accommodations from rental market ”, prescribes the cases in which an owner who desires to withdraw housing accommodations from the rental market may procure certificates of eviction. The portion of the section relied on to sustain the order here under review reads: “ A certificate shall be issued *271 where the landlord establishes that he seeks in good faith to permanently withdraw occupied housing accommodations from both the housing and non-housing rental markets without any intent to rent or sell all or any part of the land or structure and (1) that he requires the entire structure containing the housing accommodations or the land for his own immediate use in connection with a business which the landlord owns and operates in the immediate vicinity of the property in question ’ ’. The section authorizes the issuance of certificates in three other instances of withdrawal from the rental market which, while not directly applicable to the present situation, at least reflect the very limited field in which the section is intended to operate. These other instances are when: (2) substantial violations affecting health and safety have been placed on the structure the cost of removal of which would equal or exceed the assessed valuation, (3) a nonprofit educational or charitable institution requires the accommodations or land for educational or charitable purposes, (4) continued operation would impose undue hardship. Thus, except for the educational and charitable institutions which for obvious reasons receive special treatment, the section contemplates some element of hardship. There is no suggestion of hardship in this case; there hardly could be in view of the recent purchase of these tenement houses by their owner.
More important, however, is the concluding admonition of the section: “ No certificate shall be issued under this section where the granting of the certificate- is inconsistent with the purposes of the Act.”
Is the evacuation of these tenants from their homes to make room for a parking lot reconcilable with the purposes of an act intended to meet a housing emergency1? Is it consonant with a law which declares that preventive action by the Legislature is “ imperative ” to prevent “ perils to health, safety and welfare ”? (State Residential Rent Law, § 1; L. 1946, ch. 274, as amd. by L. 1955, ch. 685.)
In our approach we should bear in mind the high public interest served by this legislation. As the court said: “ In the residential rent law there is a higher public interest protected and a different class of persons for whose benefit the State has chosen to exercise its police power. In the case of the commercial rent laws' we have a matter of balancing economic interests that may not always be in harmony, but not relating to so fundamental a matter as basic shelter for human beings.” (Garay v. Todros, 282 App. Div. 126, 128-129.)
*272 Yet, interestingly enough, the commercial and business rent control laws do not authorize demolition for use of the land as a parking lot. Possession for the purpose of demolition may be obtained only when it is intended to construct a new building; temporary use as a parking lot is permitted only when construction of the new building can not be begun or approval of the plans therefor obtained because of priorities provided by the Defense Production Act of 1950 (U. S. Code, tit. 50, Appendix, § 2061 et seq.). In that situation the parking lot use may be authorized until “ such approval can be obtained or construction begun (Commercial and Business Rent Laws, § 8, subds. [c], [ce]; L. 1945, chs. 3, 314, as amd.; see, also, Maiden Lane Service Stas. v. Rubin, 5 Misc 2d 328.) It may be noted in passing that very recently the Court of Appeals upheld the 1955 extension of the business rent control law because of the legislative finding of the continued existence of the emergency. (Lincoln Bldg. Associates v. Barr, 1 N Y 2d 413.)
In our inquiry whether the eviction here contemplated is consistent with the purposes of the act, we are therefore justified in assuming that the Legislature felt at least as much solicitude for the well-being of residential tenants as that of commercial and business tenants.
The buildings occupied by the petitioning tenants were, as already stated, bought for the very purpose of tearing them down and using the land for a parking lot. This is not the case of one who has owned property for a long time and wishes to withdraw it from the rental market because its continued operation works an economic hardship. Even then, the rights of tenants in possession must be taken into account. (See Matter of New York Univ. v. McGoldrick, 205 Misc. 790, 796-797.)
It is questionable in any case whether the transaction on which the owner of these tenements has embarked, viewed realistically, may be treated as a withdrawal at all. It has all the earmarks of an acquisition, rather than a withdrawal. But, whatever its name, it plainly runs counter to the purposes of the act and thereby violates both the letter and the spirit of the regulation. An act intended to protect residential tenants in- their occupancy is flouted when families are driven from their homes for no better reason than to enable a parking lot operator, who has become a landlord for a day, to accommodate more cars and thereby to add to his profits. The emphatic declaration of section 59 of the regulations that no certificate shall be issued where granting, it “is inconsistent with the purposes of the Act” becomes meaningless when eviction from housing accommodations is allowed in such circumstances.
*273 The eviction here authorized has an aggravated feature. The demolition, being an incident of the so-called withdrawal, the eviction certificates are applied for pursuant to section 59 of the regulations. It has been held that a landlord who obtains eviction certificates on an application for withdrawal under section 59 is not obliged to provide for the relocation of his tenants (Matter of Tarnopol v. Abrams, 146 N. Y. S. 2d 253, mod. only as to length of stay, 286 App. Div. 999), and the landlord of these petitioning tenants has not been required to make such provision. Yet, a landlord who demolishes for the purpose of new construction or slum clearance applies for his certificates under section 58, and must pay the relocation expenses of his tenants. Of course, the impact of the eviction on the residential tenant is the same, whatever the reason for the demolition of the building in which he lives, whether it is labeled a demolition or a withdrawal.
There is nothing in the record to show that the owner is suffering any financial embarrassment because of its present limited space. Its lot, accommodating 42 cars, is generally filled to capacity by mid-morning. The same is true of many other parking lots throughout the city. The sole purpose of the application to the rent commission was to enable the owner to expand its parking lot business.
The administrator’s determination granting the application for withdrawal upon these facts must be held to be arbitrary and capricious. I am not unmindful of the holding in Matter of Tarnopol v. Abrams (supra). I do not, however, regard that ease as laying down a rule of general or uniform application. There the subject building, a rooming house, had been owned by the landlord or a corporation controlled by her for four years before the application was made and the sole objector was the rooming house operator or prime tenant. Its facts are clearly distinguishable.
The maintenance of the proper balance between private property rights and the larger public interest, in keeping with the underlying philosophy of the emergency housing legislation, forbids the eviction of these tenants. Their eviction would make a mockery of rent control.
The determination granting certificates of eviction is accordingly annulled. Settle order.